IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SUSAN HAMILTON,

     Plaintiff,

v.

BOYS AND GIRLS CLUB OF
METROPOLITAN ATLANTA, INC.,

     Defendant.

CIVIL ACTION NO.
1:12-CV-3609-TWT-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This case is presently before the Court on Defendant Boys and Girls Clubs of Metropolitan Atlanta, Inc.'s Motion for Summary Judgment. (Doc. 26). For the reasons outlined below, Defendant's Motion for Summary Judgment should be **GRANTED**. (Doc. 26).

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Susan Hamilton ("Plaintiff"), who is African American and fifty-five years old, filed the instant lawsuit on October 16, 2012. (Doc. 1). In Plaintiff's Complaint, Plaintiff contends Defendant Boys and Girls Clubs of Metropolitan Atlanta, Inc. ("Defendant") discriminated against her on the basis of her race when it moved her to a nonexistent and unfunded position and terminated her as part of a reduction in force

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). (Compl. ¶¶ 31-38). Plaintiff also contends that her termination and placement into the nonexistent and unfunded position constituted discrimination on the basis of her age in violation fo the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"). (Compl. ¶¶ 36-40).

Defendant contends that summary judgment should be granted as to Plaintiff's race and age discrimination claims because (1) Plaintiff cannot show that Defendant's decision to reassign her constituted an adverse employment action; and (2) Defendant had legitimate, nondiscriminatory reasons for the challenged employment actions which Plaintiff cannot show are pretextual. Defendant further contends that Plaintiff cannot show that age was the "but for" reason for her reassignment or her termination.

## FACTUAL BACKGROUND[1]

Defendant is a private, nonprofit organization that works with young people from disadvantaged economic, social, and family circumstances and serves 17,000 youth in

---

[1]All facts taken directly from Defendant's Statement of Undisputed Material Facts (hereinafter "DSMF") or Plaintiff's Statement of Additional Material Facts ("PSMF") remain undisputed. This Court must accept as admitted those facts in the moving party's statement that have not been specifically controverted with citation to the relevant portions of the record by the opposing party. LR 56.1B.2(2), (3), NDGa. Subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact in order to withstand summary judgment. See Chapman v. AI Transp., 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc); Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); Carter v. City of Miami, 870 F.2d 578, 585 (11th Cir. 1989). Thus, this Court will not consider any fact (1) not supported by citation to evidence (including a page or paragraph number); or (2) stated as an issue or legal conclusion.

AO 72A
(Rev.8/82)

30 clubs in metropolitan Atlanta. (DSMF ¶ 1; Aff. of Melissa Dugan, hereinafter "Dugan Aff.," ¶ 5). Plaintiff, who is African-American, began working for Defendant in 1977, and was promoted to the position of Vice President of Strategic Programming in 2003. (PSMF ¶¶ 1, 2). As Vice President of Strategic Programming, Plaintiff reported directly to Defendant's President. (DSMF ¶ 10). Plaintiff was responsible for planning, coordination, and overseeing implementation of a broad range of programs that support Defendant's strategic plan, program initiatives, and core program areas of health, education, and employability. (Pl.'s Ex. I).

In February 2009, Defendant's board of directors hired William Lampley, a forty-four-year-old African-American, to serve as President of the organization and Lampley began his service that month. (DSMF ¶¶ 12, 13). Lampley testified that at the time of his hire, the board was very clear that it wanted the organization to shift from a charity-centric model to a business model. (Dep. of William Lampley, hereinafter "Lampley Dep." 18-19). Lampley stated that the board wanted him to get the organization "out of the red, into the black without closing clubs impacting kids." (Lampley Dep. 19-20; Aff. of William Lampley, hereinafter "Lampley Aff.," ¶ 8). In March 2009, Lampley placed Missy Dugan in the Chief Operating Officer role to run Defendant's day-to-day operations. (Lampley Dep. 30-31; Lampley Aff. ¶ 10). Plaintiff testified that she has never heard Lampley or any other managers use racially derogatory slurs against her or make any derogatory comments about African-Americans. (Pl.'s Dep. 131-32).

### I.   Defendant Experiences a Drop in Donations and Shifts Focus to Outcome Measurement

Defendant relies upon private, corporate, individual, and United Way funding to fill the gap between membership dues and operational expenses. (Dugan Aff. ¶¶ 5, 6). For years, Defendant has operated at a budget deficit, and covered fundraising shortfalls by tapping into its investment endowment fund. (Pl.'s Dep. 133; Lampley Aff. ¶ 6). According to William Lampley, when the economy suffered a downturn, the endowment cushion continued to shrink as private, corporate, and individual donations declined. (Lampley Aff. ¶¶ 6, 7). Lampley further explains that during a tough economic climate, donors expected to see more of a return on their investment for donated dollars and became more selective about their charitable giving. (Lampley Aff. ¶ 7). Because Lampley spent a significant amount of time meeting with members of the community and potential donors, Lampley was extremely interested in being able to show the donors the success of the programs Defendant offered. (Lampley Aff. ¶ 11). As a result, Lampley wanted to see more objective measures put into place to evaluate outcome determinations of the programs offered. (Lampley Aff. ¶ 11).

Lampley testified that at some point, he was beginning to have "some doubts as to whether or not [Plaintiff] was really moving the needle from a impacting the kids perspective and then definitely doubts around how we were recapturing any impact that we were having on the young people." (Lampley Dep. 35; Lampley Aff. ¶ 12). Lampley also had doubts as to whether Plaintiff spent sufficient amounts of time in the individual

clubs where she was ultimately responsible for the programming.

According to Lampley, it was Plaintiff's responsibility to locate and find curriculum that would get children interested. (Lampley Dep. 45-46). Lampley explains that he had a series of discussions with Plaintiff regarding programming and, in particular, the lack of engaging teen programs. (Lampley Dep. 51). Lampley testified that he discussed with Plaintiff that teen numbers in the program were declining and that teens told him that the programs were the same things they had already done. (Lampley Dep. 48). Lampley testified that when he had a conversation about the "needle not moving," with respect to teen programs, Plaintiff would simply tell him that the organization was doing what "national" says we should do. (Lampley Dep. 48-50). Lampley states that he told Plaintiff he wanted engaging programs in which the organization could measure the impact that the organization was having on kids. (Lampley Dep. 51). Lampley also states that Plaintiff did not provide an adequate response on how to find engaging programs where the organization would be able to measure the impact on the children served. (Lampley Aff. ¶ 13). Lampley testified that after talking with Plaintiff, Lampley saw no changes in the program. (Lampley Dep. 49). Lampley states that he concluded someone else needed to fill the Plaintiff's role as Vice President of Strategic Programs because of his belief that existing programs in the organization were not having a sufficient impact on the children served, there were no effective teen programs, and there were insufficient qualitative measures in place to evaluate the programs. (Lampley Aff. ¶ 13; Lampley Dep. 45-46).

According to Plaintiff, when Lampley's predecessor hired her for the Vice President of Strategic Programming position in 2003, he told her that he wanted special emphasis to be placed on outcome measurements. (Pl.'s Dep. 39-42). Plaintiff admits that her responsibility included ensuring that the outcome measurements were conducted at the club level annually, coordinating with staff so outcome measurements were performed, reviewing and tabulating the information obtained, sharing the information with staff, the board, and the United Way, and making recommendations as to where the organization needed to strengthen programs based on the results. (Pl.'s Dep. 43-44). To accomplish that, Plaintiff utilized a tool developed by Boys & Girls Club of America and used by clubs across the country, but did not come up with her own tools. (Pl.'s Dep. 45-46). Plaintiff avers that she was not required to develop an outcome measurement tool and was only required to implement the organization's outcome measurement tool. (Pl.'s Aff. ¶ 9). Lampley testified that he did not believe that the tools that they received from the national organization provided a qualitative measure. (Lampley Dep. 43-44).

Plaintiff states that Lampley never shared his views of performance measures with her or his view that the national organization's outcome measurement tool was not adequate. (Pl.'s Aff. ¶ 10). Plaintiff further states that Lampley never shared his concerns about the lack of teen programs with her. (Pl.'s Aff. ¶ 11). Plaintiff testified that neither Lampley nor Dugan ever expressed concerns about her performance and that when she asked Lampley whether he was satisfied with her performance in March or

6

April 2009, Lampley told her that he was satisfied. (Pl.'s Dep. 74-75). Plaintiff admits in her deposition, however, that in April 2009, Lampley met with her and told her that he did not think Plaintiff was a good fit for her Vice President of Strategic Programming position, but did not give her the specific reasons for his conclusion and told her he would talk to her about it later. (Pl.'s Dep. 94-97). Lampley told Plaintiff he did not think that she was happy in the position. (Pl.'s Dep. 95).

## II.    **Lampley Places Plaintiff Into a New Role**

Lampley states that because of Plaintiff's tenure and commitment, he believed that Plaintiff was still a good fit for the organization. (DSMF ¶ 47). Thus, Lampley decided to transfer Plaintiff to lead the pilot program for the national organization's participation in the Center for New Generation ("CNG") program. (DSMF ¶ 50; Lampley Aff. ¶¶ 14, 15; Lampley Dep. 67-68, 70, 86). The CNG program was an academic enrichment program created by Condoleezza Rice to help bridge the academic gap in lower income students. (Lampley Aff. ¶¶ 14, 15). According to Lampley, he believed that the CNG program was going to be a flagship example for not only metro Atlanta but for the nation. (Lampley Dep. 73). If the pilot was successful, Defendant's goal was to transition the program to other clubs in the metro Atlanta area. (Pl.'s Dep. 101; DSMF ¶ 51). Lampley states that the CNG program was a more appropriate position for Plaintiff because it was an established, self-driven program model that already had outcome measurements in place. (Lampley Aff. ¶ 15). Lampley formally announced Plaintiff's reassignment on May 26, 2009. (DSMF ¶ 58; Pl.'s Dep. 110, Ex. 29;

AO 72A
(Rev.8/82)

Lampley Aff. ¶ 15). Lampley testified that he had no intention of terminating Plaintiff at that time. (Lampley Dep. 67-68).

Plaintiff's new title was to be the Vice President of Center for New Generation. (Lampley Dep. 73). Plaintiff's reporting relationship within the organizational chart remained the same. (Lampley Dep. 73). The CNG position from a hierarchy perspective was on the same level, Plaintiff's office location did not change, Plaintiff's pay did not change, and Plaintiff retained her company car and benefits. (Lampley Dep. 73; Pl.'s Dep. 48; Dugan Dep. 43-44, 145-46; DSMF ¶ 62). Plaintiff maintains, however, that she was already providing oversight of the CNG program as part of her former role as Vice President of Strategic Planning. (Pl.'s Dep. 88; Pl.'s Aff. ¶ 12). Plaintiff admits that she presented the new CNG program initiative to the board, that it was a valid initiative of the agency, and that she was not upset when she was moved into the new position. (Pl.'s Dep. 99-103; DSMF ¶ 57).

The national organization promised to provide funding for the pilot program, and at the time of Plaintiff's reassignment, Lampley believed that the national organization would provide the funding as it promised. (Lampley Dep. 65-72; Pl.'s Dep. 87). The national organization, however, did not come through with the funding for the pilot as it had promised. (Lampley Dep. 65-66; Pl.'s Dep. 87).

Plaintiff never was able to get started in the new position because just after her new role was announced, she was out of work for a number of weeks on both medical and personal leave unrelated to the transition. (DSMF ¶ 123). There was no formal

8

Personnel Action form completed for Plaintiff's move to her new role. (PSMF ¶ 52).

**III.  Claire Guitton Becomes the Vice President of Strategic Programs and Outcome Measurements**

According to Lampley, Lampley, Dugan, and Jeff Quesenberry evaluated who should replace Plaintiff in a restructured Programming Vice President position, to be titled Vice President of Strategic Programs and Outcome Measurements. (Lampley Aff. ¶ 16; DSMF ¶ 66). The goal was to place more of an emphasis on outcome measurements in the new role. (Lampley Aff. ¶ 16). Lampley states that he, Dugan, and Quesenberry selected Claire Guitton, a forty-three year old Caucasian who worked for Defendant for approximately twenty-one years, because they felt that she was the most qualified person in the organization to direct the organization's programming. (Lampley Dep. 16; DSMF ¶ 67). Guitton previously served as a regional Vice President and was responsible for overseeing programming and operations in a number of the organization's individual clubs and was considered instrumental in making sure that programs were run correctly at the club level. (DSMF ¶¶ 67-68; PSMF ¶ 36). Dugan states that she and Lampley focused in on Guitton because of Guitton's ability to deliver on a regular basis the knowledge of a specific club's needs and to deliver really good information regarding which clubs were delivering programs accurately and which ones were not. (Dugan Dep. 63-66). Additionally, in Dugan's opinion, Guitton's clubs were performing the best. (Dugan Dep. 68). Lampley announced Guitton's placement in the Strategic Planning and Outcome Measurement position in an email dated June 4, 2009, which reiterated the emphasis that the organization was placing on outcome

9

measurement and the efforts to raise investment money.  (DSMF ¶ 72; Pl.'s Dep. 116, Ex. 32).

## IV.   **Defendant Reduces Its Workforce After United Way Cuts Defendant's Funding**

On June 16, 2009, The United Way, a significant funder for the organization, informed Defendant, without warning, that it was cutting Defendant's funding by 25% or approximately one million dollars for the next fiscal year.  (DSMF ¶ 74).   The organization was already experiencing endowment losses and a decline in private, corporate, and individual donations. (Lampley Aff. ¶ 18).  Thus, Lampley states that the organization had to make difficult decisions as to how to significantly reduce its expenses over the next year without closing clubs.  (Lampley Aff. ¶ 18).  Due to the shortfall, Defendant reduced its workforce by 12% and reduced the remaining full-time employees' salaries by 5%. (Lampley Aff. ¶¶ 19-21).  Plaintiff avers that the fiscal year for Defendant was October to September and that the 2009 budget was balanced through the end of the fiscal year.  (Pl.'s Aff. ¶ 7).

Lampley, Quesenberry, and Dugan decided which positions to eliminate as part of the reduction in force ("RIF").  (DSMF ¶¶ 81, 82).  In determining which positions to eliminate, Lampley, Quesenberry, and Dugan considered every full-time job within the organization, but initially focused on administrative office positions.  (Dugan Aff. ¶ 10). The goal was to find positions within the organization which, if eliminated, would have the least impact on the children served and would not result in closing down any clubs. (Dugan Aff. ¶ 10).  According to Dugan and Lampley, the positions that had the

10

least impact were eliminated. (Dugan Aff. ¶ 10; Lampley Aff. ¶ 19). In all, fifteen full-time positions were eliminated, effective June 30, 2009. (DSMF ¶ 87). Thirteen out of the fifteen positions eliminated were held by African-American employees and two were held by Caucasian employees. (DSMF ¶ 92). At the time, Defendant's workforce was predominately African American. (DSMF ¶ 93).

According to Lampley and Dugan, Plaintiff's position was eliminated as part of the RIF mainly because the promised funding for the CNG program had not materialized as of the date of the RIF decisions. (Lampley Aff. ¶ 20). Plaintiff does not dispute that the funding for the program did not happen by the time of the RIF. (DSMF ¶ 96). Lampley states that he believed in the CNG program, but given the severe economic decisions the organization had to make, the CNG program was viewed as a luxury that the organization could not afford at the time. (Lampley Aff. ¶ 20). Therefore, the CNG role was deemed to be a position that could be eliminated because it would not involve closing the organization's clubs. (Dugan Aff. ¶ 14; Lampley Aff. ¶ 20).

Defendant's Personnel Action/Change Form, dated June 29, 2009, the day of the elimination of Plaintiff's position, indicates that she was the Vice President of Strategic Programming. (Lampley Dep., Ex. 3). According to Lampley, the failure to reflect her new job title on the form was a human resources oversight. (Lampley Dep. 125).

## LEGAL ANALYSIS

### I.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for his motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Apcoa, Inc. v. Fid. Nat'l Bank</u>, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required, however, to negate his opponent's claim; the movant may discharge his burden by merely "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like.[2] <u>Id.</u> at 324 (quoting Fed. R. Civ. P. 56(e)).

---

[2] In December 2010, amendments to Rule 56 became effective, and Rule 56(c)(1) now regulates a party's procedure for asserting that a fact is not genuinely in dispute (or is genuinely in dispute):

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, <u>Nat'l Parks Conservation Ass'n v. Norton</u>, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material when it is identified as such by the controlling substantive law. <u>Id.</u> at 248. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." <u>Anderson</u>, 477 U.S. at 249-50. Thus, the Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322.

## II.   **Plaintiff's Age Discrimination Claim**

Plaintiff contends that her removal from the Vice President of Strategic Programming position and reassignment to the Vice President of CNG position constituted discrimination on the basis of her age in violation of the ADEA. (Compl.

13

¶¶ 36-40). Defendant contends that Plaintiff's age discrimination claims fail because Plaintiff cannot show that Defendant's decision to reassign her constituted an adverse employment action and Defendant had legitimate, nondiscriminatory reasons for the challenged employment actions which Plaintiff cannot show are pretextual. Defendant further contends that the ADEA requires Plaintiff to also show that age was the "but for" reason for her reassignment and her termination, and Plaintiff has failed to do so. Additionally, Defendant contends that the fact that Plaintiff contends that the challenged employment decisions were based on her race negates that age could be the "but for" reasons for the decisions. Plaintiff does not respond to Defendant's arguments on this issue and only addresses her race discrimination claims in her brief. Accordingly, summary judgment should be **GRANTED** as to Plaintiff's age discrimination claims because Plaintiff abandoned them. Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); Bute v. Schuller Int'l Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding plaintiff abandoned a claim for retaliation under the ADA by failing to respond to defendant's argument on summary judgment that plaintiff failed to exhaust administrative remedies); Marion v. DeKalb Co., GA, 821 F. Supp. 685, 688-89 n.4 (N.D. Ga. 1993) (holding that plaintiff abandoned his negligence claim by failing to respond to defendant's motion for summary judgment on this issue in plaintiff's response brief); see also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) (stating that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned" while declining to exercise its

14

discretion to consider on appeal an argument in response to defendant's motion for summary judgment which plaintiff had previously failed to allege).

### III.   Plaintiff's Race Discrimination Claims

Plaintiff contends Defendant discriminated against her on the basis of her race when Defendant reassigned her to the CNG role and terminated her as part of a RIF in violation of Title VII and Section 1981.  (Compl. ¶¶ 31-38).  Defendant argues Plaintiff's race discrimination claims fail because (1) Plaintiff cannot show that Defendant's decision to reassign her constituted an adverse employment action and (2) Defendant had legitimate, nondiscriminatory reasons for the challenged employment actions which Plaintiff cannot show are pretextual.

#### A.   Plaintiff's Move From the Vice President of Strategic Programming Position

Defendant first argues Plaintiff cannot establish a prima facie case of race discrimination with respect to Plaintiff's move from the Vice President of Strategic Programming position because given that Plaintiff's pay, benefits, status as a Vice President of a high profile position did not change, and Plaintiff did not suffer an adverse employment action.  Plaintiff contends that the shift to the CNG Vice President position was an adverse employment action because she no longer had direct reports.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).  "Section 1981 prohibits intentional race discrimination in the making

15

and enforcement of public and private contracts, including employment contracts." 42 U.S.C. § 1981(a); Ferrill v. Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999); see also Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609 (1987) (noting Section 1981 has been construed to forbid all racial discrimination in the making of contracts).

Claims brought under Title VII and Section 1981 all require proof of intentional discrimination and should be analyzed together using the same McDonnell Douglas/Burdine burden-shifting framework that is utilized in Title VII claims. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); Richardson v. Leeds Police Dep't., 71 F.3d 801, 805 (11th Cir. 1995) (explaining that claims under Section 1981 and 42 U.S.C. § 1983 utilize identical methods of proof as Title VII claims and are governed by the McDonnell Douglas framework); Howard v. B.P. Oil Co., 32 F.3d 520, 524 n.2 (11th Cir. 1994). In order for Plaintiff to prevail on her discrimination claims, Plaintiff must show that Defendant intentionally discriminated against her on the basis of her race using direct evidence, statistical evidence that shows a pattern or practice of discrimination, or circumstantial evidence based on the four-pronged test outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973). See Kilpatrick v. Tyson Foods, Inc., 268 F. App'x 860, 861 (11th Cir. 2008); Walker v. NationsBank of Fla., 53 F.3d 1548, 1555-56 (11th Cir. 1995); see also Denney v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001) (citing EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000)).

Because Plaintiff has presented no evidence of a pattern or practice of

discrimination or direct evidence, Plaintiff must prove discrimination through circumstantial evidence, thus invoking the McDonnell Douglas/Burdine burden-shifting analysis. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Under the McDonnell Douglas/Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination on the basis of race or gender. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 253. If the plaintiff meets her burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254; Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). This burden is one of production, not persuasion, and is "exceedingly light." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994); Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1141 (11th Cir. 1983). The plaintiff will then be given an opportunity to show that the defendant's proffered nondiscriminatory reason was merely a pretext for discriminatory intent. Burdine, 450 U.S. at 253; Chapman, 229 F.3d at 1024.

To establish her prima facie case of race discrimination, Plaintiff must show that (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside his protected class more favorably or she was replaced by a person from outside her protected class. Howard v. Oregon Television, Inc., 276 F. App'x 940,

942 (11th Cir. 2008); <u>Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ. Ex rel. Univ. of S. Fla.</u>, 342 F.3d 1281, 1289 (11th Cir. 2003).   Thus, to establish unlawful discrimination on the basis of race under both Title VII and Section 1981, an employee must show that he or she suffered from an adverse employment action. <u>Jackson v. Hall Cnty. Gov't</u>, 518 F. App'x 771, 772 (11th Cir. 2013); <u>Hyde v. K.B. Home, Inc.</u>, 355 F. App'x 266, 268-69 (11th Cir. 2009); <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1239 (11th Cir. 2001); <u>Doe v. DeKalb County School Dist.</u>, 145 F.3d 1441, 1445 (11th Cir. 1998).   To establish an adverse employment action, "an employee must show a serious and material change in the terms, conditions, or privileges of employment," as viewed by a reasonable person in the circumstances. <u>Davis</u>, 245 F.3d at 1239. "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances" <u>Id.</u> Not every unkind act is an adverse employment action; it is not enough that the challenged employment action imposes some de minimis inconvenience or alteration of responsibilities.   <u>Doe</u>, 145 F.3d at 1453.   Although proof of direct economic consequences is not required in all cases, the asserted impact "cannot be speculative and must at least have a tangible adverse affect on the plaintiff's employment." <u>Id.</u>; <u>see also</u> <u>Hyde</u>, 355 F. App'x at 269; <u>Gray v. Vestavia Hills Bd. of Educ.</u>, 317 F. App'x 898, 904 (11th Cir. 2008).

AO 72A
(Rev.8/82)

1.    Plaintiff's Reassignment Was Not an Adverse Employment Action

In this case, it is unlikely that Plaintiff's transfer to the Vice President for CNG position constituted an adverse employment action.  Plaintiff's reporting relationship within the organizational chart remained the same.  (Lampley Dep. 73).  The CNG position from a hierarchy perspective was on the same level, Plaintiff's office location did not change, Plaintiff's pay did not change, and Plaintiff retained her company car and benefits.  (Lampley Dep. 73; Pl.'s Dep. 48; Dugan Dep. 43-44, 145-46; DSMF ¶ 62).

Plaintiff contends that the shift to the CNG Vice President position was an adverse employment action because she no longer had direct reports.  Plaintiff, however, does not provide evidentiary support for this factual allegation.  This Court is not required to cull through the materials submitted by the Plaintiff searching for evidence that shows the absence of a disputed issue or creates a disputed issue.  That is the obligation of the Plaintiff's counsel.  See United States v. Adkinson, 135 F.3d 1363, 1378-80 (11th Cir. 1998); Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1373 (11th Cir. 1997); Dickson v. Amoco Performance Prod., Inc., 845 F. Supp. 1565, 1570 (N.D. Ga. 1994) (noting that "[i]t should be the party's responsibility to direct the court's attention separately to each portion of the record which supports each of the party's distinct arguments").  Even assuming, however, that Plaintiff could provide factual support for her contention that she lost direct reports, the Eleventh Circuit has concluded that a demotion claim grounded on a loss of supervisory responsibility is not

19

favored because "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." Kidd v. Mando Am. Corp., 731 F.3d 1196, 1203 (11th Cir. 2013); Davis, 245 F.3d at 1244 (noting that courts have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm). In the vast majority of instances, an employee alleging a loss of prestige on account of a change in work assignments without alleging tangible harm will be outside the protection afforded by Congress in Title VII's anti-discrimination clause. Davis, 245 F.3d at 1245. Here, Plaintiff cannot prevail on her claim that the loss of supervisory responsibility equated to an adverse employment action unless she demonstrates that her case is one of those unusual instances where the change in responsibilities altered the terms and conditions of her employment. Kidd, 731 F.3d at 1203; Davis, 245 F.3d at 1244 ("[E]ven accepting that Davis may have felt some blow to his professional image when he was removed as OIC, that is simply not enough to prevail on this record."). In this case, Plaintiff failed to demonstrate that she not only lost direct reports, but also that any loss of supervisory authority made such a disparate shift in Plaintiff's responsibilities that it altered the terms and conditions of her employment. This case is not analogous to the example cited by the Eleventh Circuit in Davis v. Town of Lake Park, 245 F.3d 1232 (11th Cir. 2001), in which a plaintiff alleged that he had been relieved of his supervisory duties, assigned to clean toilets as a janitor, and later reassigned to a shipping department where

he was expected to perform physical tasks difficult or impossible for him to complete. Id. at 1245

In the case presently before the Court, Plaintiff further infers within her opposition to Defendant's Statement of Undisputed Material Facts that the new position was a step down because she was already providing oversight of the CNG program in her former role as Vice President of Strategic Planning. (Pl.'s Dep. 88; Pl.'s Aff. ¶ 12). There is no evidence, however, that while Plaintiff was performing her former position that the CNG program required the degree of Plaintiff's contribution as necessary to lead the pilot program. Plaintiff does not point to evidence showing details of her "oversight" such that the Court can make any meaningful comparison between her former "oversight" duties and her intended duties as the leader of the pilot program. Even if it could be assumed that Plaintiff's reassignment involved substantial diminution of duties, Plaintiff still cannot show that her reassignment was an adverse employment action because Plaintiff never got started in the new role because she was out of work for a number of weeks for both medical and personal leave. (DSMF ¶ 123; Pl.'s Dep. 88, 110-11). Under these circumstances, Plaintiff does not present sufficient facts to create a genuine issue of material fact as to whether the change in position amounted to an adverse employment action. Kidd, 731 F.3d at 1204 (concluding that employee who did not suffer a decrease in pay or a loss of title, but only lost supervisory responsibilities did not suffer an adverse employment action).

2.      Plaintiff Cannot Demonstrate That Defendant's Reasons for Her
Reassignment Were Pretextual

Nevertheless, even if it is assumed that Plaintiff can establish that her change in job responsibilities amounted to an adverse employment action, Plaintiff's claim still fails because Plaintiff fails to raise a genuine issue of material fact as to whether Defendant's reasons for her reassignment were pretexts for discrimination.  Lampley states that Plaintiff needed to change roles because he felt that the existing programs in the organization were not having a sufficient impact on the children served, there were no effective teen programs, and there were no sufficient qualitative measures in place to evaluate the programs.  (Lampley Aff. ¶ 13; Lampley Dep. 45-46).

Because Defendant presents legitimate, nondiscriminatory reasons for Plaintiff's reassignment, the burden switches to Plaintiff to establish pretext.  Burdine, 450 U.S. at 253; Chapman, 229 F.3d at 1024.  A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff casts sufficient doubt on the defendant's proffered non-discriminatory reasons to permit a reasonable factfinder to conclude that the proffered reasons were not actually what motivated its conduct.  Brooks v. Cnty. Common of Jefferson Cnty., 446 F.3d 1160, 1162-63 (11th Cir. 2004).  This may be accomplished either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.  Id.  In doing so, the court evaluates whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its

22

action that a reasonable factfinder could find them unworthy of credence." <u>Combs v.</u> <u>Plantation Patterns, Inc.</u>, 106 F.3d 1519, 1538 (11th Cir. 1997).

Plaintiff appears to argue Defendant's stated nondiscriminatory rationale was pretextual because she never received a less than satisfactory evaluation under her former supervisor, Lampley never evaluated Plaintiff while he was her supervisor, and a short time after Lampley was hired, Plaintiff asked Lampley what he thought of her job performance, he told her she was "doing fine." (Pl.'s Motion ¶ 7; Pl.'s Br. 1, 4, 18). Plaintiff also argues her replacement, Guitton, was less experienced and less qualified than Plaintiff, who already had amassed six years of experience with outcome measurements. (Pl.'s Motion ¶ 7; Pl.'s Br. 1, 4, 18).

Plaintiff's assertions that her former supervisor always gave her positive evaluations do not raise a genuine issue of material fact as to pretext. Different supervisors may impose different standards of performance and may prioritize different job functions. <u>McCann v. Tillman</u>, 526 F.3d 1370, 1377 (11th Cir. 2008); <u>Rojas v.</u> <u>Florida</u>, 285 F.3d 1339, 1343 (11th Cir. 2002) ("Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."); <u>Chapman</u>, 229 F.3d at 1031 n.21 ("Different decision-makers are entitled to be concerned about different things."). Indeed, in this case, the Defendant's board indicated that it wanted to take the organization in a different direction and that it wanted Lampley to spearhead that cause. (Lampley Dep. 18-20). Furthermore, the fact that Lampley never formally evaluated

AO 72A
(Rev.8/82)

Plaintiff while he was her supervisor does not raise any suspicion because Plaintiff and Lampley only worked together for approximately four months. Finally, Plaintiff's evidence that Lampley thought she was "doing fine," in March or April 2009 is not significantly probative given that Plaintiff does not present any evidence as to whether Lampley told her she was doing fine during the period in which he decided to reassign her. Lampley only started working with the organization sometime in February 2009. (DSMF ¶ 12). Thus, Plaintiff presents no evidence that when Lampley made these statements, Lampley had the opportunity to assess her skills with respect to whether the programs Plaintiff oversaw had a sufficient impact on the children served, whether the teen programs were effective, and whether there were sufficient qualitative measures in place to evaluate the programs. Additionally, any such statement by Lampley is consistent with Defendant's theory that Plaintiff's tenure and commitment was still a good fit for the organization and that Plaintiff should be reassigned. This is not a case where the Defendant is alleging Plaintiff was being reassigned because her skillset was useless; Lampley simply was attempting to utilize Plaintiff's skills in a different area. Moreover, Plaintiff admits that by some point in late April 2009, Lampley met with her and told her that he did not think that she was a good fit for the Vice President of Strategic Programming position. (Pl.'s Dep. 94-97). Thus, Lampley's alleged statement that Plaintiff was doing fine does not raise suspicion.

Furthermore, Plaintiff's evidence in her attempt to show that Guitton was less experienced and less qualified than Plaintiff does not suffice to demonstrate pretext in

24

this case.  Qualifications evidence may suffice, at least in some circumstances, to show pretext.  Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006).  However, a plaintiff with superior qualifications cannot show pretext unless the disparities in qualifications are of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the employee retained over the plaintiff for the job in question.  Chavez v. URS Fed. Tech. Servs., 504 F. App'x 819, 823 (11th Cir. 2013); Kidd, 731 F.3d at 1206.  Plaintiff, who has the burden of proof, fails to present sufficient evidence to meet this standard.  Plaintiff states that she believed that Guitton was less qualified than her for the position because Plaintiff had performed the role for years and Guitton held a lower position in the organization.  (DSMF ¶ 112).  Plaintiff admits, however, that she has no knowledge about Lampley's vision for the position, the specific outcome measurement expectations Lampley had for the revised position, how Lampley viewed Guitton's qualifications, or what qualifications made Lampley decide to place Guitton in the position.  (Pl.'s Dep. 131).

While Plaintiff had more experience in the former Vice President of Strategic Programming position and longer tenure with the organization, these factors alone are not sufficient to meet the standard where it appears that Guitton had gained experience similar to Plaintiff's experience.  Like Plaintiff, Guitton, who Defendant had employed for twenty-one years, had oversight responsibilities over programming and was responsible for implementation of programs.  (Pl.'s Ex. I).  As regional vice president, Guitton oversaw programming implementation and operation and made sure that the

programs were delivered in the way programs were supposed to be delivered. (Dugan Dep. 64). Additionally, it is undisputed that Guitton was considered "instrumental" in making sure that programs were run correctly at the club level. (DSMF ¶¶ 67-68; PSMF ¶ 36). Although Plaintiff has six years of experience in the position and outcome measurement,[3] Defendant has indicated that it was not satisfied with Plaintiff's outcome measurement. In contrast, Dugan and Lampley stated that they believed that Guitton had a better understanding of what programs were being impactful, was able to deliver on a regular basis the knowledge of a specific club's needs, and was able to deliver really good information on which clubs were delivering programs accurately and which ones were not. (Dugan Dep. 63-66; Lampley Dep. 93). Dugan states that she and Lampley discussed that Guitton "would know what and how to deliver a program that then would have an outcome that we could utilize in terms of good information" that could be given to a donor. (Dugan Dep. 62). Under these circumstances, the differences between Plaintiff's and Guitton's qualifications cannot be found to be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen Guitton over Plaintiff. See, e.g., Kidd, 731 F.3d at 1206-07 (rejecting plaintiff's argument that defendant's reasons for selecting another for assistant accounting manager position was pretextual due to disparate qualifications even though plaintiff claimed to

---

[3] Although Plaintiff states in her Statement of Additional Material Facts, that Guitton had no prior knowledge or experience with outcome measurements, the source to which Plaintiff cites does not support her factual allegation. (PSMF ¶ 43; Dugan Dep. 62).

AO 72A
(Rev.8/82)

have more management experience, claimed to possess a stronger educational background, had been serving in the position in an acting role for a year and a half, and was an internal candidate and known quantity).  Because Plaintiff has failed to raise a genuine issue of disputed material fact as to whether her reassignment was an adverse employment action or whether Defendant's proffered nondiscriminatory reasons for her reassignment were pretextual, summary judgment should be **GRANTED** as to Plaintiff's claim that her reassignment was discriminatory.

### B.    <u>Plaintiff's Inclusion in the Reduction in Force</u>

Plaintiff further contends that Defendant discriminated against her on the basis of her race when it eliminated her position as part of a RIF.  Defendant contends that summary judgment should be granted as to Plaintiff's claim because Plaintiff cannot establish a prima facie case of discrimination given that Plaintiff failed to proffer any evidence that her selection for the RIF was based on her race and Plaintiff cannot show that Defendant's nondiscriminatory reasons for her selection in the RIF were pretextual.

In reduction-in-force cases, a plaintiff establishes a prima facie case of discrimination by "(1) showing that she was a member of a protected group and was adversely affect by an employment decision; (2) proving that she was qualified for her position or to assume another position at the time of the discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that [her] employer intended to discriminate against [her] in making the discharge decision."  <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1331 (11th Cir.1998); <u>Jameson v. Arrow Co.</u>, 75

27

F.3d 1528, 1531 (11th Cir. 1996); <u>see also</u> <u>Lawver v. Hillcrest Hospice, Inc.</u>, 300 F. App'x 768, 772 (11th Cir. 2008); <u>Smith v. J. Smith Lanier & Co.</u>, 352 F.3d 1342, 1344 (11th Cir. 2003).

Even assuming that Plaintiff can establish her prima facie case, Plaintiff's claim still fails because Plaintiff cannot raise a genuine issue as to whether the reasons for her termination were pretextual. In this case, Defendant indicates that Plaintiff's position was eliminated as part of the RIF mainly because the promised funding for the CNG program had not materialized as of the date of the RIF decisionmaking. As a result, Lampley viewed the program as a luxury the organization could not afford and thus, concluded that the CNG role should be eliminated because doing so would not involve closing the organization's clubs. (Lampley Aff. ¶ 20; Dugan Aff. ¶ 14). Because Defendant has proffered a nondiscriminatory reason for Plaintiff's inclusion in the RIF, the burden of proof shifts back to Plaintiff to produce evidence that Defendant's proffered reasons were pretexts for discrimination. <u>Connor v. Bell Microproducts-Future Tech., Inc.</u>, 492 F. App'x 963, 965-66 (11th Cir. 2012).

Plaintiff argues Defendant's proffered justification is unworthy of credence because (1) the Vice President of CNG position never existed, was not funded, and was not going to be funded; (2) there was no physical evidence of her reassignment to the position; (3) the position need not have been eliminated because the funding for the CNG program was to come from the national organization; (4) Defendant did not have a RIF policy; and (5) more African-American employees than Caucasian employees

28

were eliminated as part of the RIF.

1.   <u>Plaintiff's Evidence Is Not Sufficient to Lead a Reasonable Factfinder to Conclude That the CNG Position Never Existed</u>

The evidentiary record in this case does not support Plaintiff's conclusion that the CNG role never existed. It is undisputed that CNG role was not funded at the time of the RIF, but Plaintiff fails to present evidence that Defendant knew the position would not be funded at the time that it placed her in the position. Indeed, Lampley testified that based on the promises of the national organization and description of the program the national organization gave Defendant, Lampley believed that Defendant had an available position. (Lampley Dep. 68). Lampley indicated that he believed that the national organization would provide the funding for the program as it promised, but it did not do so. (Lampley Dep. 65-72; Pl.'s Dep. 87). While Plaintiff asserts that Defendant knew that the position would not be a funded position within the organization as of April 2009, Plaintiff provides no evidentiary support for her allegation.

Plaintiff attempts to discredit Lampley's statements that he believed an existing position was available and that he believed the national organization would be providing the funding by contending that Defendant cannot produce one document showing the existence of the position. Plaintiff further notes that her separation notice and personnel action/change form reflects that she was terminated from the position of Vice President of Strategic Programming position and not Vice President for CNG. Contrary to Plaintiff's assertions, Defendant has produced physical evidence of Plaintiff's placement in the new role. Lampley formally announced in an email directed to all of the

organization that Plaintiff would be assuming a new role within the organization, and that she would be leading the Center for New Generation program. (Pl.'s Dep. 110, Ex. 29; DSMF ¶ 58; Lampley Aff. ¶ 15; Lampley Dep. 125). Moreover, Lampley explains the failure to officially reflect Plaintiff's CNG role in paperwork as being a "human resources oversight." (Lampley Dep. 125-31). Plaintiff does not present any evidence tending to show that the failure to document her change in position in human resources forms was not a human resources oversight.

Plaintiff further argues in support of her theory that CNG position never existed that the CNG position was never approved by Defendant's Human Resources Department, Defendant never provided her with a job description, no form was completed in personnel to document her new role or title, and her new position was not identified in the organizational structure. (Pl.'s Motion 34; Pl.'s Br. 13). Plaintiff, however, fails to provide evidentiary support for the proposition that Defendant's human resources department never approved her position. Defendant's omission to provide Plaintiff with a job description, failure to complete a personnel action form to document her new role or title, and omission to adjust the organizational chart to reflect her new role, is not sufficient to show that human resources never approved her new position or that her position never existed, because Plaintiff does not lay any foundation for human resources procedures. Plaintiff fails to present evidence of any approval practices in place within the human resources department or human resources' practices on the preparation of job descriptions or organizational charts. Plaintiff also does not cite to

evidence laying any foundation for what forms human resources completes to document a new role or human resources practices with respect to completing such forms. Similarly, Plaintiff fails to provide any evidence as to when human resources prepares any such forms documenting a change in an employee's position title or develops a new organizational chart depicting changes. In this case, Plaintiff's move to the CNG role was announced on May 26, 2009, but Plaintiff never got started in the CNG role because she was out of work for a number of weeks for both medical and personal leave, and the CNG position was eliminated in the RIF on June 30, 2009. Thus, there was a month-long window for human resources to complete any such forms before Plaintiff's position was eliminated and there is no indication that human resources would be under any urgency to complete any such paperwork given that Plaintiff was out on leave. Thus, without information as to what functions human resources performs when reassigning an employee to a different position and when human resources performs such functions, the failure to perform such functions within the narrow window Plaintiff was to hold the CNG position, a time period in which Plaintiff was taking extended personal leave, does not advance Plaintiff's cause. (DSMF ¶ 123; Pl.'s Dep. 88, 110-11; DSMF ¶ 87; PSMF ¶ 24). Finally, contrary to Plaintiff's argument that the CNG position never existed, Plaintiff admits that she presented the new CNG program initiative to the board and that it was a valid initiative of the agency. (Pl.'s Dep. 99-103). Thus, the evidence in this case is not sufficient to allow for a reasonable factfinder to conclude that the CNG position did not exist.

31

2.    The Separate Funding for the Program Does Not Discredit Defendant's Rationale for Eliminating the Position in the RIF

Plaintiff further contends that Defendant's reasons for selecting the CNG position for elimination as part of the RIF should be discredited because the CNG position had separate funding from the national organization and therefore, the shortfall in the metro-Atlanta organization would not affect the funding. Plaintiff, however, ignores Defendant's stated rationale, that the funding from the national organization had not come through at the time of the RIF and that the CNG program was, at that point, a luxury that Defendant could not afford. (Lampley Aff. ¶ 20). A plaintiff is not allowed to substitute his business judgment for that of the employer. Chapman, 229 F.3d at 1030. Provided that the employer's proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. Chapman, 229 F.3d at 1030; see also Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (holding that federal courts do not sit as a super-personnel department that reexamines an employer's business judgment). Whether the decision was prudent or fair is irrelevant. Rojas, 285 F.3d at 1342. This Court's inquiry therefore is limited to whether the employer gave an honest explanation of its behavior. Elrod, 939 F.2d at 1470. Given that it is undisputed that the national organization's funding had not materialized, that Defendant was facing a one-million dollar funding short-fall from the United Way contributions, and that Defendant was suffering from endowment losses as well as a decline in private, corporate, and individual donations,

it would not be unreasonable at that point for Defendant to conclude that it was unwise for it to float the funding for the CNG program in hopes that the national organization would make good on its promise to fund the program. Accordingly, Plaintiff's evidence fails to raise a genuine issue of material fact as to whether Defendant gave an honest explanation for the decision to eliminate her position. (DSMF ¶ 74).

### 3.   Lack of RIF Policy

Plaintiff further appears to contend that because Defendant "had no RIF policy" and never had a RIF policy since its existence, and Defendant violated "all of its own human resources policies," a reasonable factfinder could conclude that the basis for her selection for the RIF was pretextual. Plaintiff, however, fails to present any evidence that Defendant violated all of its human resource policies, evidence as to what the human resources policies were, or evidence as to how Defendant may have violated any policies. Additionally, although Plaintiff presents her own affidavit solely stating that "there was no RIF policy in BGCMA," Plaintiff's bare statement in that regard does not establish that Defendant did not create RIF criteria for determining which positions should be eliminated as part of the RIF and Plaintiff produces no evidence supporting the notion that Defendant did not follow its stated criteria.

### 4.   Plaintiff's Statistical Evidence Does Not Demonstrate Pretext

Finally, Plaintiff appears to suggest that the fact that eleven of the thirteen employees terminated as part of the RIF plan were African-American shows that racial discrimination motivated Defendant's decisionmakers instead of Defendant's stated

justification. A plaintiff, however, cannot show disparate treatment by merely citing statistics. See Chavez v. URS Fed. Tech. Servs., Inc., 504 F. App'x 819, 822 (11th Cir. 2013) (citing Burke–Fowler v. Orange Cnty., 447 F.3d 1319, 1325 (11th Cir. 2006). Without any analytical foundation, statistical evidence is "virtually meaningless" and cannot be probative of pretext. See Chavez, 504 F. App'x at 822; Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). Thus, statistical calculations must come from a witness, not a party's lawyer. Mitchell v. City of Lafayette, 504 F. App'x 867, 870 (11th Cir. 2012). Indeed, even if discriminatory-looking statistics could satisfy the plaintiff's prima facie burden, such statistics cannot support an inference of intentional discrimination if the data can be explained in a plausible, neutral fashion. See Chavez, 504 F. App'x at 822; Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1316 (11th Cir. 1998). Here, Plaintiff provides no analytic foundation for the statistical information. Additionally, Plaintiff fails to provide any evidence to dispel Defendant's race neutral explanation for the statistic--that Defendant's workforce was predominately African-American. (DSMF ¶ 93). Because Plaintiff has failed to raise a genuine issue of disputed fact as to whether Defendant's race-neutral justification for her inclusion in the RIF was pretextual, summary judgment should be **GRANTED** as to Plaintiff's discriminatory termination claim.

## CONCLUSION

Based on the foregoing reasons, this Court **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED**. (Doc. 26). As this is a final Report

and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED,** this 21 day of July, 2014.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

35